J-S40029-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| N.L.P., | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| S.M.K., | : | |
| | : | |
| Appellant | : | No. 292 WDA 2015 |

Appeal from the Order entered February 4, 2015,
Court of Common Pleas, Blair County,
Civil Division at No. 2011 GN 134

BEFORE: FORD ELLIOTT, P.J.E., DONOHUE and STRASSBURGER*, JJ.

MEMORANDUM BY DONOHUE, J.:                    **FILED JUNE 26, 2015**

Appellant, S.M.K. ("Father"), appeals from the order entered on February 4, 2015 by the Court of Common Pleas of Blair County awarding joint physical and legal custody of S.N.G.-K. ("Child") to Father and Appellee, N.L.P. ("Mother"). For the reasons that follow, we affirm.

The relevant facts and procedural history of this case are as follows. Mother and Father are the biological parents of Child, who was born in September 2009. Mother and Father met while employed at Cresson State Correctional Institute. Mother is a registered nurse and Father was a corrections officer. Both Mother and Father are currently retired from employment with the Commonwealth. Mother and Father never married, but lived together for a brief period, and separated when Child was approximately fifteen months old. Mother is currently engaged to J.B., with

*Retired Senior Judge assigned to the Superior Court.

whom she has had an intimate relationship since approximately October 2013.

Prior to the events surrounding this appeal, Mother and Father equally shared custody of Child pursuant to an order entered by the trial court on December 23, 2011. On October 2, 2013, Father filed a petition to modify the custody order seeking primary custody of Child because he wanted her to attend pre-kindergarten in Ebensburg, Pennsylvania, where he currently resides.

Father claims that in November 2013, Child disclosed to Father's mother and sister that J.B. had inappropriately touched and kissed Child. Upon learning this information, Father took Child to the Logan Township Police to file a report. At that time, Sergeant David Hoover ("Sergeant Hoover"), a child abuse investigation specialist, attempted to interview Child, but she refused to talk to him. Father then went to the Blair County Courthouse to request an emergency protection from abuse order ("PFA") against J.B. Father later withdrew his request for a PFA because Mother agreed that there would be no contact between Child and J.B. pending the outcome of a forensic interview by Logan Township Police and Blair County Children, Youth, and Family Services ("CYF"). Because there was no evidence that any inappropriate touching or kissing occurred, both Logan Township Police and CYF determined that the allegations of abuse against J.B. were unfounded.

On December 31, 2013, Mother filed a petition for a custody evaluation based upon her concern that Father was influencing Child to make these abuse allegations against J.B. In early 2014, Douglas Ramm, Ph.D ("Dr. Ramm"), a forensic psychologist, performed the custody evaluation. In his report, Dr. Ramm stated that he was unable to determine whether J.B. had sexually abused Child or whether Father had improperly encouraged Child to lie about the allegations. Custody Evaluation, 5/6/14, at 21-22. Dr. Ramm concluded, however, that J.B. had a number of negative personality traits, including narcissistic and paranoid tendencies and that J.B. was a significant source of stress for Child. *Id.* at 11, 21. Dr. Ramm further concluded that if Child was to have further contact with J.B., she should develop a therapeutic relationship with a therapist and that her first contact with J.B. should occur in the presence of the therapist. *Id.* at 22.

Mother engaged Shirley Knapp ("Knapp") in response to Dr. Ramm's recommendation that Child receive counseling prior to having contact with J.B. Father objected to Knapp's counseling as Mother did not inform him of her counseling prior to its commencement and he believed it did not follow Dr. Ramm's recommendations because J.B. was involved in the counseling sessions. Knapp conducted four separate one-hour sessions with Child that included Mother and J.B. and found Child's interaction with J.B. was appropriate. N.T., 7/18/14, at 5-6.

The trial court held a half-day custody hearing on July 18, 2014. Both Mother and Father requested additional time to present more witnesses and the trial court held another hearing on December 10, 2014. Prior to the December 10, 2014 hearing, another incident occurred prompting another investigation by the Logan Township Police and CYF. According to Mother, Child accidentally injured herself in her vaginal area by cutting herself with a clothes shaver. N.T., 12/10/14, at 40-41. Father claimed, however, that Child told Father's mother that J.B. did this to her. Father and Father's mother took Child to the hospital. Child reported at the hospital that J.B. had caused her injury. *Id.* at 85. Only Father's mother was with Child when she made this report as Father had opted to stay in the waiting room. *Id.* at 86. Based on these allegations, CYF arranged for a second forensic interview and decided to place Child in foster care in order to prevent either Mother or Father from influencing Child before the forensic interview. CYF placed Child in the custody of Dorrie Raihl ("Raihl").

The second forensic interview did not reveal whether J.B. was abusing Child or whether Father was improperly influencing Child to lie about the sexual abuse allegations. Sergeant Hoover, who was present for the second forensic interview, concluded that the alleged child abuse did not occur and the allegations arose from Father's influence. *Id.* at 12, 17. Furthermore, Raihl testified that she overheard several telephone conversations between Child and each of her parents while Child was in her care. *Id.* at 126-27.

Raihl stated that Mother's conversations with Child were appropriate, but that Father attempted to improperly influence Child. *Id.*

On February 4, 2015, the trial court entered an order granting Mother and Father joint physical and legal custody of Child. The order stated that Child's primary residence during the school year was to be with Mother, that Child was to attend school in the Altoona Area School District, and that Mother and Father would equally share custody over the summer. On February 19, 2015, Father filed a timely notice of appeal and contemporaneously with his notice of appeal, Father filed his concise statement of the errors complained of on appeal pursuant to Rule 1925(a)(2)(i) of the Pennsylvania Rules of Appellate Procedure.

On appeal, Father raises the following issue for our review and determination:

> Whether the [c]ourt erred in determining in looking through the custody factors that [factors one, four, eight, nine, ten, and thirteen] all significantly favored [Mother] and was the main reason why custody was granted toward [Mother]?

Father's Brief at 4.

We begin by acknowledging our scope and standard of review for custody cases:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent

factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*J.R.M. v. J.E.A.*, 33 A.3d 647, 650 (Pa. Super. 2011) (quoting *Durning v. Balent/Kurdilla*, 19 A.3d 1125, 1128 (Pa. Super. 2011)).

"With any child custody case, the paramount concern is the best interests of the child." *Id.* The legislature enacted section 5328(a) of the Child Custody Act in order to delineate the "factors the trial court must consider when awarding any form of custody." *Id.* at 651 (citation omitted). Section 5328(a) sets forth a list of factors that trial courts must consider "in a best interests of the child analysis in making any custody determination." *E.D. v. M.P.*, 33 A.3d 73, 79-80 (Pa. Super. 2011) (citing 23 Pa.C.S.A. § 5328(a)) (footnote omitted). The factors listed in section 5328(a) that trial courts must consider when determining a child's best interest include:

> (1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

> (2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide

adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of

unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

42 Pa.C.S.A. § 5328(a).

In this case, the trial court based its custody decision on its determination that Father improperly influenced Child to make false allegations of abuse by J.B. Trial Court Opinion, 2/4/15, at 9. The trial court's findings regarding Father's behavior are as follows:

> There is nothing in the record that supports Father's beliefs or accusations against [J.B.] This [c]ourt states here that it does not believe that [J.B.] has had any inappropriate contact whatsoever with [Child] and any prohibitions of contact of [J.B. with Child] are no longer necessary[.]
>
> *     *     *
>
> The [court,] relying on Sgt. Hoover, [CYF], the counseling report of [Knapp], and finally the report of conduct [by Raihl], comes to the inescapable conclusion that Father's efforts to improperly influence [Child were] done without any consideration of the consequences which they inflict upon her.

Trial Court Opinion, 2/4/15, at 15-16.

Based on these findings, the trial court concluded that factors one (which party is more likely to encourage and permit frequent and continuing

- 8 -

contact between the child and another party), four (the need for stability and continuity in the child's education, family life and community life), eight (the attempts of a parent to turn the child against the other parent), nine (which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child), ten (which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child), and thirteen (the level of conflict between the parties and the willingness and ability of the parties to cooperate with one another) of section 5328(a) each strongly favored Mother.[1]

Father argues that the trial court's finding that he improperly influenced Child to make false claims of sexual and physical abuse against J.B. is not supported by the record. Father's Brief at 11. Father contends that there is evidence in the record supporting Child's claims of abuse and neither Dr. Ramm's custody evaluation nor either of the two forensic interviews were conclusive as to whether Father improperly influenced child. **See id.** at 13-18. Father also points to other evidence in his favor, such as Dr. Ramm's report revealing that Child told Dr. Ramm that J.B. abused her and Dr. Ramm's conclusion that J.B. was a significant source of stress for Child. **See id.** at 15-16.

---

[1] The trial court found that the remaining factors of section 5328(a) either did not apply or minimally influenced its decision. **See** Trial Court Opinion, 2/4/15, at 9-14.

Father's argument asks to reweigh the evidence in his favor and disregard the evidence of record relied upon by the trial court. This we cannot do. *See J.R.M.*, 33 A.3d at 650. The certified record on appeal supports the trial court's determination. Raihl, Child's foster parent, testified that she overheard Father attempting to improperly influence Child to lie about J.B. N.T., 12/10/14, at 126-27. Specifically, Raihl testified:

> Q. Okay, and Ms. Raihl, there's been conflicting testimony that one or the other parent made efforts to contact [Child] prior to when she went to that evaluation. Would you have known of any contact that was made to [Child] while she was under your care, ma'am?
>
> A. She had regular phone calls with both parents usually on a daily basis.
>
> Q. Okay. And would you have as part of what you do, do you listen to those phone calls, Ms. Raihl?
>
> A. She --- [Child] sat rather close to me a few times and I could overhear some of the phone calls.
>
> Q. Okay. And Ms. Raihl, from the conversations that you directly heard, did either parent make any efforts at all to influence or to persuade [Child] to say one thing or another?
>
> A. I never heard her mother say anything other than she missed her and loved her[,] normal conversations. There [were] a few conversations with her father that [Child] got extremely upset about and my husband and I both were listening to the one phone call because it didn't sound right and he was talking about something about taking her away and asked her if she liked airplanes and trains and something else, it's only forty some dollars to take her to Disney and as soon as he gets her and if

she does what he tells her to do he's going to buy her all this stuff and take her on a trip. So that kind of sounded odd so I wrote that all down and turned that in the day of that [sic] she went to State College.

\* \* \*

A. There [were] a few times that, you know, they were talking about something called the truth or like daddy's truth and another truth and I wasn't really sure what they were talking about. When I questioned [Child,] she just said that her daddy gets mad that she doesn't lie. I didn't know what she was talking about so I asked her and she just said that she's supposed to lie about this guy named [J.B.] and I said who's [J.B.] She said that's mommy's boyfriend and that she liked him and she liked her mommy but she was afraid of her daddy because he would get angry whenever she wouldn't lie and that was the only thing that [Child] ever told me.

*Id.* Sergeant Hoover likewise testified that based on his experience and time spent with Child, he believed that Father was influencing Child to lie about the allegations of abuse pertaining to J.B. *Id.* at 17.

Moreover, there is ample evidence of record supporting the trial court's conclusion that J.B. had not been abusing Child. Sergeant Hoover testified that there has never been sufficient evidence to charge J.B. with any crime. *Id.* at 16-17. Kirin McCaulley testified on behalf of CYF that the outcomes of both of CYF's investigations into the claims of abuse against J.B. were unfounded and that there was not enough evidence to support any of the allegations. *Id.* at 122-23. Furthermore, Knapp testified that during her

counseling sessions with Mother, J.B., and Child, she observed Child and J.B. exhibit a healthy interaction during which Child appeared "very carefree, no anxiety noted, no stress." N.T., 7/18/14, at 6.

Therefore, based upon our review of the certified record, the evidence supports the trial court's determination that Father improperly influenced Child to make false allegations of sexual abuse against J.B. and that factors one, four, eight, nine, ten, and thirteen of section 5328(a) favored Mother. Accordingly, Father is not entitled to any relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/26/2015